Good morning. Good afternoon. Thank you. If it's morning, where are you? I can't help you. I got in late last night, Judge. May it please the Court, my name is Michael Berthune with me on the briefs on the table, and Michael Kielski from Udall-Shem White. Your Honors, we offer you a coherent interpretation based on the text and consistent with the democratic purpose of the 17th Amendment. Against that, the defendants offer an interpretation that would allow procedural rules to trump substantive constitutional rights and that The purpose of the 17th Amendment, as set forth in the first section, is the direct election of Senators. That's the animating purpose, the whole reason for the Amendment. Hold on to that idea of that first clause. Because the claims in this case, of course, turn on the second clause, the second section, the Vacancy Clause. Plaintiffs argue that the Vacancy Clause provides for limited representation by a political appointee until an orderly election may be had, consistent with Section 1 of the 17th Amendment. Defendants argue that the temporary appointee can serve indefinitely. Well, you were counsel in the Judge case, right, when President Obama became President and the Governor sold the seat, right? Tried to sell it. So, based on the Judge case, would you say that the law at least has understood from the few cases we have, is that there is at least some temporal limit to what temporary means? Is that a fair statement? The Judge case didn't address that at all, Your Honor. Didn't address it at all. Did not address it at all. What's your reading of the meaning of the Judge case? The Judge case narrowly stands for the proposition that there has to be a writ of election ordered. And I think that the states have started following that, because when you look at the Arizona law, there's nothing in the law that empowers the Governor to issue a writ, yet he knew to do it anyway. Why? There's no timing component at all to judge from your perspective. Correct, Your Honor. So, as long as the writ of election is issued within an hour before the end of the Senator's term, that's okay? No. That issue wasn't raised, wasn't briefed. Okay. So, that's why we're here today. Yes, Judge. Okay. Let me ask you, I think we were writing on a clean slate. I think there's some force to your argument, but we have the Supreme Court's affirmance of the Valenti decision, and the Supreme Court seems to have endorsed that and treated it as a holding in Rodriguez. And that, of course, approved a 29-month-long temporary appointment. So, what are we to make of that? Let me take it in reverse order. I'll start with Rodriguez. Now, from the start, the 17th Amendment doesn't apply to Rodriguez at all. It doesn't apply to Puerto Rico. They don't have Senators. Congress has never incorporated the 17th Amendment to apply to Puerto Rico. It wasn't the holding of Rodriguez, but they characterized Valenti as a decision of the court. They didn't just say, well, it's just a summary affirmance, it doesn't count. Well, on Valenti, I think it is a summary affirmance. And when we looked at that, we briefed this at page 32 of our opening brief, the Mandel v. Bradley case, and then again in Anderson v. Celebrezzi, highlight the fact that when a court reviews a case that comes up and gives a summary affirmance, it's not reviewing the reasoning. It's just reviewing the holding. Rodriguez did characterize the reasoning and the holding. It said the fact that the 17th Amendment permits a state, if it chooses, to forego a special election in favor of a temporary appointment to the United States Senate. And I take that reference to a special election to refer to the ability to put someone in office until the next regular election, which was the pattern in Rodriguez. How do you get around that characterization of the holding of Valenti? Well, I'd characterize it as dicta to begin. As I said before, the 17th Amendment could not apply to what was being decided in Rodriguez. So any discussion of the 17th Amendment could not be central to the holding of Valenti. Assume I don't agree it's dicta. How do I get around it then? How do you distinguish it? One way is I'd say that there's been a passage of time and a development of other precedent, including significantly the elections clause jurisprudence in Kofi Greilich and U.S. term limits in Key Thornton, which talk about how the state cannot use procedural regulations to determine political substantive outcomes in elections. That would be one of the main ways I would distinguish that. Let me ask you this. Even if it is dicta, this is the Supreme Court of the United States we're talking about. Both our case line, I know Judge Noonan wrote about that in one of our cases, and I think the Supreme Court itself has made it clear that when they say something, even though it may not be essential to the holding, that this is binding on the courts of appeal. Do you disagree with that? I'm not as familiar with the case. I think you mentioned a case that I'm not as familiar with, Judge. Oh, the one with Judge Noonan? I'll get it for you in a second, but go ahead, and then I'll give you the quote. Sure. What I would look at is other things that the court has said. So, for example, when you're looking at the court's treatment of the times, places, and manner provision, in Cashton v. Republican Party, for example, it said this authority, the procedural authority under the times, places, and manner clause, does not extinguish the state's responsibility to observe the limits established by the First Amendment rights of the state's citizens. The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote, seconded in Westbury. The problem, though, is that Rodriguez, on the next page, characterizes the burden in Valenti as minimal. It says, however, the effect, when it talks about the Commonwealth's choice to fill legislative vacancies by appointment, then goes on to say, however, the effect is minimal, and like that in Valenti, it does not fall disproportionately on any discrete group of voters, candidates, or political parties. So if they're characterizing the burden as ultimately minimal, how can we say that for purposes of this line of cases, we should consider it to be severe? There's at least two distinctions, Judge Collins. The first is, again, intervening Supreme Court precedent, the Burdick framework. That postdates Valenti. And under Burdick, as this court ruled in Soltysik, if I'm saying that correctly. It doesn't matter. We know what case you're talking about. You know, it looked and said, we take this seriously. You've got to have a real showing. And I don't think that the second point, I'll come back to in a second, but the second point is, this isn't an even-handed regulation, and it is discriminatory. It has a partisan outcome, like L. Rodney Burns prohibits. So you are switching gears, are you not? Well, let me come back to Soltysik. We were talking about Valenti and Rodriguez, and I want to give you this quote. It's Zed versus Schwepp, and it's 1992. And Judge Noonan says, dicta of the Supreme Court have a weight that is greater than ordinary judicial dicta. It's prophecy of what that court might hold. We should not blandly shrug off because they were not in the holding. I wouldn't disagree with Judge Noonan. Yeah, I think the Supreme Court has said something like that itself. So can we agree amongst ourselves that what Rodriguez says, even though it wasn't essential of the holding, does at least characterize how the Supreme Court viewed Valenti in terms of not disagreeing with its holding, which involved a 29-month period after Senator Kennedy was shot before he was replaced, right? I think it expressed some – you're right, Judge. It did express some accord with that idea. But I want to point out a couple of practical things when we're talking about Valenti and Rodriguez because I get the sense this is really important for you guys. We guys are that way. Keep in mind, you've seen more cases than I have and probably ever will with your case load here in the Ninth Circuit. Each case is to some extent limited by the people who litigate it and the issues they decide to brief and the issues they bring to the table and sometimes the facts that the judges decide to write into the opinion or the facts and arguments that the judges decide to leave out of the opinion. So when you look at Valenti, when I've gone back and read the record, it looks like what the plaintiffs there were seeking was they wanted an election. The only thing they sought is relief was an election in November of 68. So that's what they were saying we want. So when you look at how you get from the complaint to a 2-1 decision by a three-judge panel to an appeal by right, not a cert petition, but an appeal by right to the U.S. Supreme Court where the court can only dismiss or summarily affirm, I think that that gives enough room for you to come in and say we are going to be the first court to do a real textual analysis and to give a real interpretation of the first paragraph of the 17th Amendment recognizing the primacy of the right to a direct elected representation and the vacancy clause. With respect, I was going to ask you about textualism in terms of reading this. When you look at the text, much of your argument is not there. As a matter of fact, your very distinguished amicus brief is entirely made up of legislative history. My colleague on the left, Clerk for Justice Scalia, he was shocked. He was shocked that it was there. In any event, the reality is that if you look at the text, it doesn't help us much. But if you look beyond that, you're right. This was a progressive era change designed to put the power in the hands of the people instead of the legislature. But it did, in the proviso, it clearly calls for a role of the state legislature. Then we have the Supreme Court with Valenti and Rodriguez. And the question is, what do we do with that? If there were no Valenti, I might feel a little more comfortable with your position. But with Valenti and Rodriguez, how do we just ignore that? Well, let me address one thing that you said that I disagree with, Judge. I disagree that our approach is not textual. And when you look at the text, the same language that Senator Bristow talks about, it is the same language. You don't need his statement saying that. All you have to do is look at the words on the piece of paper. But with respect, that doesn't matter. He was taking language from what happens with the House of Representatives. But in the House of Representatives, if a representative dies, there's nobody representing the district. In the Senate, at least one other person is representing the state. It seems to be quite an apposite to me that the language taken from the House provisions is somehow relevant to this. I get that's what he did, but it certainly doesn't bind us in any way in connection with a six-year term versus a two-year term, does it? I think it does. And you mentioned Judge Collins' time with Justice Scalia. And in our reply brief, we mentioned whether you call it in pari materia or there's another word for it that escapes my mind at the moment. But when you look at the same language that's used in parallel statutes, you interpret them the same way. And it's not just there. Whenever you look, if you look at Justice Thomas' dissent in the Arizona intertribal case, he talks about those two clauses in exactly the same way as meaning the same thing. So that's why we brought in ACLU v. Taft and Jackson v. Ogilvie, the two federal appellate cases that interpret that same language from the House. And that's where we tried to come at this as a textual analysis. What does that text mean? And then to go with that, of course the proviso doesn't mean nothing. What we read the proviso as doing is carrying over the recess appointments provision that existed in the Senate in the original Constitution. If you remember, under the original Constitution, the electors for the Senate was the state legislature. So the temporary appointment lasted as a recess appointment until the electors, then the state, now the people, until the electors have the opportunity to make the selection of the senator. But with respect, don't we have a very different situation in the early part of the last century as opposed to 1789? You know, they had little of the transportation that we now have and so on. And you have a very different role by the states themselves. They all have different roles. They have different times in which they meet. It seems like at least four of the changes that have occurred, you've got at least two years. So what are we supposed to be looking at? As I understand it, you've amended your complaint several times to change the remedy which you seek in terms of timing. What do you seek now? What exactly are you asking us to do? We want you to issue an order consistent with ACLU v. Taft and Jackson v. Ogilvie that says that, one, the executive has to promptly issue the writ. Immediately? In Taft, they said basically within a day of learning. Okay, so you issue the writ of election. What happens to the primary? What happens to the campaigns? Who decides who's going to run? Justice Holmes had a phrase that in order for government to operate, there has to be a little bit of play in the joints. Okay, so what have we got? We've got two years plus play in the joints? What have we got? I think two years is way more than play in the joints. Oh, no, the two years isn't play in the joints. The play in the joints is after that. And I think that's what you had in Valenti. You had two years plus the play in the joints. I view the play in the joints as giving a certain margin of appreciation to the states under the Times, Places, and Manners Clause. That Times, Places, and Manners Clause. And remember, the 17th Amendment didn't upset the Elections Clause at all. The judge said that. Right. That that margin of appreciation given to the states in exercising their power under the Times, Places, and Manners Clause is a little play in the joints. But didn't Taft, in setting, you know, the standard that it did to, you know, proceed more expeditiously, didn't it in footnote three specifically distinguish the Senate situation as presenting a different situation that might not be governed by the same rule? I don't specifically recall footnote three at the moment, Judge Collins. Footnote three, it says the probativeness of Valenti, and this is in Taft, is substantially diminished by the fact that it addressed a vacancy in the Senate, and then it goes on to explain some of the differences. Doesn't that suggest that the Seventh Circuit itself, in establishing how to read the timing requirements of the provision for the House, was acknowledging that it might not apply in the same way to the Senate? I think that there could, but remember, we've got this other issue lurking in the background of the verdict balancing test. They still have to come back and say, as we showed in figure one of our opening brief, under Arizona law, Arizona's legitimate regulatory interests can be met in a period of 190 days in order to have an orderly election. What justifies a delay beyond that? And there's nothing in the record explaining what their, they gave three reasons. Cost, which I think is a dubious justification. Voter turnout, which there's no evidence explaining what a material voter turnout would be, or what the voter turnout would be when the best comparator of the Doug Jones election is 40%, and voter confusion, which there's absolutely no explanation, and that's where Soltysiak comes in big time. But didn't Valenti also consider not just whether or not it should have been in 68, but whether it also should have been held in the state election in 1969? Didn't it also consider that intermediate time? I don't recall seeing that, Judge, and my memory may be faulty on this. I mean, it does say that on page 855. It said, since we reject the suggestion that an election in 1968 is constitutionally required, we must also answer another question. Does the 17th Amendment prohibit New York from bypassing its general election in 1969 in favor of filling the vacancy in November 1970? And then goes on to answer that question that they're not required to do it in 1969. So doesn't this suggest that Valenti is more of an obstacle for you than you're suggesting? I don't think so, Judge. And, you know, I think when you look at the intervening case law verdict, the Elections Clause cases, when you look at the 2-1 decision that has a summary affirmance on an appeal by right, I think when you look at all that, I think that this Court has a clean slate to offer the first real interpretation of the second section of the 17th Amendment. So from your perspective, Valenti-Rodriguez doesn't really mean much? Correct, Judge, and I see I'm under three minutes. Okay, you want to save the rest of your time for rebuttal? Yes. That's fine. Thank you. Very well, let's hear from the Arizona parties. May it please the Court, I'm Dominic Dre. And with Annie Foster, I represent the appellees. This case is about timing. Plaintiffs asked the Court to change the date on which they and every other voter in Arizona will vote on whether Senator McSally finishes the term that she's currently serving. The request is not new, and it's not based on the Constitution. It is, in fact, 51 years old, and it's the exact same pair of arguments that were before the three-judge court summarily affirmed by the Supreme Court in Valenti, and it should be rejected for the exact same reasons. The two substantive arguments that they make under the 17th Amendment focus on one scrap of legislative history from a single senator and on an infelicitous analogy to House vacancy elections. The legislative history piece hinges on one sentence from Senator Bristow, who is admittedly an important drafter of the 17th Amendment, but what he says is that there's the exact same language. So I use the exact same language. But the exact same language only appears in the part of the 17th Amendment requiring a writ of election. There is no exact same language between the House vacancies in Article I, Section 2, and anything in the 17th Amendment concerning vacancies. So he can't possibly be talking about the legislative history that would be applicable or, excuse me, about the same language that would be applicable to this case. For that reason, by the way, Valenti noted that the history of this case falls well short of being persuasive of any meaning. Your response to the argument that textually the exact same words are used in the provision on writs of election for House elections as is used in the first clause of the applicable language in the 17th Amendment, shouldn't it be given the same construction? And if that in the House context has been construed to mean forthwith or as soon as practicable, why shouldn't it have the same interpretation? I can think of three responses on this point. The first one is that the issue is not live here. Senator McCain passed away on August 25th of 2018. Governor Ducey issued the writ of election on September 5th. So 10 days passed. I think that even under the plaintiff's interpretation, that would be sufficiently hasty to issue the writ. No, I'm referring to the fact that the Seventh Circuit cases dealing with House vacancies have said that the writ of election has to set the date at a date that conducts the election as soon as practicable. On that point, context matters. In the House context, that is the only instruction for the governor to be involved. He's to issue the writ. In the 17th Amendment, the language goes on. And the other side sort of suggests at various times that the proviso isn't really part of the 17th Amendment or it should be construed very narrowly. Their authorities on that are unpersuasive. Among other things, they cite a case where there was a proviso added years later that was not part of the original language. But, frankly, even under the strictest interpretation, there's no way to write the proviso out of the 17th Amendment. And so I'm perfectly fine saying that the issuance of the writ has the same timeline. We can assume that for the sake of argument today, whether it's for a House vacancy or a Senate vacancy. But that's where the similarities stop. And it was complied with here. The governor issued the writ. We all knew the date of the election. It was a date certain as of that time because it's statutorily prescribed. And at that point, any analogy to House vacancies is completed. Suppose that a state had a law that said that following the gubernatorial appointment, the election will be at the end of the term. So maybe you've got a few months. Maybe you've got five years and 11 months. Would that be permissible? No, that wouldn't be. Why not? For the reasons that we trace out in the brief about the meaning of temporary. Temporary has to have some meaning. I agree with the other side on that point. And as we point out from contemporary dictionaries and from a great 1905 case from North Carolina that breaks down the meanings of the ‑‑ excuse me, that's not the same thing. But as we point out from contemporary dictionaries at least, the meaning of temporary was some specified amount of time or for some special purpose. If a state's provision said that the appointee would serve until the end of the term, regardless of when the vacancy occurred, sometimes an appointee will serve until the end of the term because vacancy occurs late in a senator's term. But that would be the only way to violate the temporary requirement, is if it were, in fact, always a permanent appointment. I mean, if it was until a month before the end of the term, that would be okay then? It would at least comply with at least the meaning of the word temporary. Now, it would be a different question possibly under the voting rights claim that the other side levies because then a state's interest in deferring until one month before their regularly scheduled election would probably be weaker than having it coincide with the intervening general elections, which I assume Your Honor is supposing in this hypothetical. But as for the meaning of temporary under the 17th Amendment, that would probably comply. It would be sort of stupid but constitutional, and sometimes that's the role that courts and that the 17th Amendment carve out for the states, is that they retain an important role in this process. What does the temporary appointment of Senator Kyle do to the analysis of the 17th Amendment issue? I mean, the governor appointed him rather quickly, and I think he served to the end of the year, right? Something like that. That's correct, yes. What does that do, if anything, to our analysis? Happily nothing because the vacancy that's being filled would be the same date if it were the McCain vacancy or the Kyle vacancy. So the court doesn't need to wade into whose exit from that Senate seat triggered the current appointment for Senator McSally. Now, the plaintiffs in this case have changed their theory of the remedy several times, have they not, and what specifically have they asked for and why did they change it if they said? I mean, that's really a question for Mr. Pursoon, but the one thing that I would point out is they originally asked for the issuance of the writ of election, which I've acknowledged just a moment ago in discussing with Judge Collins, that that does probably need to issue rather quickly after a vacancy occurs. They were factually mistaken on that because the writ of election had issued on September 15th of 2018, and so that had to be amended out of the complaint because it was satisfied. I honestly don't know where we are right now on what the constitutional limit that the other side envisions is. It's changed, and the district court traces this out. Judge Himetawa. That's what I was going to ask about because Judge Himetawa specifically commented about the fact that they seem not to know exactly what they wanted because they kept changing their mind. Does that make any difference in our analysis? I mean, what it does is it underscores the fact that there isn't a constitutional rule at work here. If even the proponents of a position don't have a clean answer from day one, then it seems to me that that's some indication that there is just not a rule to be discerned in the text of the 17th Amendment. Can I follow up on Judge Miller's hypothetical? Suppose you had a senator who was elected and then died right after being sworn in at the beginning of the term on January 3rd, and suppose the state law said that even in that circumstance you skip forward two general elections so that the person would get four years but then stand and then the replacement would serve the remaining two. Would that be consistent with the 17th Amendment and the voting rights case's verdict? Skipping a general election that you otherwise could easily meet in terms of the timing? Sure. Yes, it would be consistent with the 17th Amendment. I'm less confident about the Anderson-Burdick analysis for that kind of case. Again, it remains a temporary appointment. If the rule is you always skip, I assume the state statute would take a form like you always skip one general election and then you catch the next one, and that would equate to approximately four years in Your Honor's hypothetical. That is still temporary inasmuch as the rule isn't we appoint the appointee and he serves until the original term ends. So it is still temporary within the meaning of that word. It's not necessary, of course, to decide this for the present case because here we're talking about a much more restrained state law that says it's 150 days before the primary triggers the rollover to the next general election. But as a hypothetical matter and to sort of tease out the meaning of the 17th Amendment, it really only gives us temporary. And the concept of temporariness has itself sort of evolved or it ties back to the original unamended Constitution. There temporary was defined by the next meeting of the legislature. And so you had a sort of cap on temporary that would have put it within a year or two years, although the historical analysis in Valenti indicates that there were many appointments before the 17th Amendment that lasted longer than a year. But there you had a cap baked into the definition in the statute. In the 17th Amendment, temporary is followed again by the word until, but now it's until the people can elect as the legislature may direct. And finishing out the sentence is important to appreciate the role that remains for the states in regulating under the 17th Amendment. As for the Anderson-Burdick analysis, that might become more of a challenge for a state that could feasibly have held an election at the next general, which in your honors hypothetical is something like 18 or 20 months later. There the state interests at issue here that are long established state interests would not come into play as forcefully as they do when you have a death as untimely as Senator McCain's. What do we do with the fact that after the 17th Amendment was passed, you have a number of legislatures in various of our states who reach different conclusions about how they're going to meet. Sometimes it's every other year, sometimes it's every year, and so on. And it seems like a number of them are every two years roughly. What role, if any, should that play in our analysis? You're asking about the pre-amendment constitution or post-amendment? Post-amendment. So there's a great expression of the state's role under the 17th Amendment in the Trincy v. Pennsylvania case, which we discussed at some length below, but I apologize for not citing this time. It's at 941 F. 2nd, 224. And in that case, the Third Circuit, this is following the death of Senator Hines, which created a vacancy, and there the lawsuit was over parties selecting the nominees for the vacancy election versus having a primary that's open. And in that context, the Third Circuit said that the explicit provision in the vacancy paragraph of the 17th Amendment, vesting discretion in the state legislatures not once but twice, cannot have been without significance. There are two references. The legislature gets to empower the governor, and it gets to direct how the election will ultimately occur. That can't be without significance. And as the Trincy court explains, the 17th Amendment comes up in the context of a discussion about exactly how much the 17th Amendment is going to shut the state legislatures out of the selection of U.S. senators. And there is a whole continuum of opinions on how much they should be excluded. The absolute sort of populist position that would have turned it into just another version of the U.S. House doesn't carry the day on every provision. There are these carve-outs and involvements for the state legislature that remain in the amendment. And although the legislative history, there is literally not one statement in the floor debates about the vacancy-filling provision of the 17th Amendment, which is a surprising fact. But what we have is a rather easy-to-read text, I think, when it comes to the assignment of regulation to the state legislatures. And we know that that authority is rather broad in Article I, Section 4, which in the Tarzian, I think, Tarzian versus Republican Party of Connecticut case that the Supreme Court explains that states' authority to set time, place, and manner is broad, their word. That carries over into the 17th Amendment. Could I ask you about the requirement that the appointee be of the same party as the senator who created the vacancy? So suppose a state said, you know, we're worried that the governor is going to appoint his young and inexperienced cronies to the position. So we're going to have a statute that says that anyone appointed must be at least 35 years old.  We're going to say 35. Would that be consistent with U.S. term limits? I think that it would because U.S. term limits speaks only in terms of an election. There is no precedent, to my knowledge, involving restrictions other than, excuse me, restrictions that depart from or add to the qualifications clause in the appointments context. But the qualifications clause isn't about elections, right? Article 1, Section 3 says no person shall be a senator who doesn't. For sure. So why, if you can't add, if the state can't add qualifications for an election, why should it be able to add qualifications for an appointment? Well, so the qualifications clause is not cabined to elections. All of the precedent interpreting it is. And subsequent to the qualifications clause, we get the amendment that U.S. term limits actually sort of suggests would be necessary in the context of an election, which is something to change the qualifications. You'd have to amend the Constitution, the Supreme Court says. Well, in the context of appointments, that's actually precisely what happened. And so in the appointments context, it has to be read through the 17th Amendment, this new layer of authority for states to regulate. States can, in fact, leave the seat totally open. So they have the authority to deny the governor the ability to appoint anyone at all. And so tying his hands on something like a party requirement is a much lesser intrusion. The text is the authority to set qualifications or restrictions on whom the governor can appoint. Where is that in the 17th Amendment? It's in the language saying that the legislature may empower the executive to make an appointment. And that word empower, as we discuss in our briefing, carries with it a wide range of latitude. And this is where the language in the contemporary dictionaries that we cite and also in that 1905 North Carolina case adds some texture to what is otherwise sort of an unclear term. It seems like empower is just to give the state the option to decline to have any gubernatorial appointments ever serve and to adopt sort of the House model for the Senate for that state, which some states did. It doesn't suggest that the legislature shares the appointment authority with the governor so that they have to essentially agree on the person who can fill it. Respect to that, I'm not sure that that is the only way to read the word empower. I think that the fact that they could refuse to allow the governor to appoint anyone as a logical matter has to include the lesser authority to say that that person must be, say, of the same political party. They say it has to be from a list of three supplied by the legislature? I suppose that they could. That would be an interesting matter for state law to sort out whether that's crossing over the line. But as to the 17th Amendment, I don't see any reason or any prohibition in that language about empowerment that would go the extra mile and reinstitute on a temporary basis the old model of legislative selection and say, here's your person, you're empowered to appoint this person we've picked. That one would probably be a harder one to defend. I will grant that. But at that point, it looks too much like what was repealed out of the Constitution. But short of something, I mean, this is not unlike the discussion we were having just a bit ago about temporariness. There is wide latitude in the text and structure of the 17th Amendment, which covers a lot of discretion. And it has, in fact, covered a wide variety of programs by the states. The other thing I must note while we're talking about the empower language and the party requirement is that that only binds the governor. In this case, there's absolutely no standing argument for plaintiffs here to challenge that. It could only be if Governor Ducey, for example, didn't want to appoint someone or didn't want to appoint a Republican. But in this case, I represent the governor and he is not injured by this restriction. As he said at the time and continues to think, Senator McSally is uniquely qualified to represent the people of Arizona. And so the obligation to appoint and the obligation to select a Republican did not restrict his latitude at all. Do you believe that we would even reach or need to reach the issue of the governor limits the appointment to somebody of the same party and so on because there's no one withstanding to appeal that point in this case? Oh, I assume that Your Honor is thinking about the case that the other side cites from the over-breath context, Broderick v. Oklahoma. The problem with that is that that is an exception to the standing rule. Broderick is talking about a special standing allowance in the First Amendment for the chilling of speech because the whole theory is that people will have chilled speech and so they'll never actually break the law. That's an exception. And if anything, it only underscores that the normal rule, requiring an actual injury and redressability, that's an injury that's concrete and particularized rather than some sort of generic injury that every citizen shares in common, that that would be the rule applicable in the current case. But in this case, Judge Shemituwa found that none of the plaintiffs had any possible injury as a result of it because there's no possible way that Governor Ducey would have appointed them or anyone they were proposing. Does that mean we don't deal with that issue? Yes. Yes, it does. And for that reason and the others, the court should affirm Judge Shemituwa's decision below.  Thank you. Well, you have some rebuttal time, counsel. Did you have another question? Yeah. Could I ask you to start by addressing the point that your friend just finished with, and that is, I mean, the governor said, you know, here today and in his brief that he would have appointed Senator McSally either way. So how is there any, how are you suffering any injury that's traceable to the statutory requirement? In a number of ways, but the most fundamental is a loss of representation in the same way. And I'd say to United States v. Hayes on this, which we put in our briefs. U.S. v. Hayes was a racial gerrymandering case. And there the injury suffered was described by the Supreme Court as, quote, when a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group rather than their constituency as a whole. That was held to be an injury in fact. And here where a U.S. Senator is picked to appeal to one partisan group, that elected official is more likely to believe that her primary obligation is to represent that party rather than her constituency as a whole. But that's because, I mean, in, in those kinds of cases, you know, the alternative to being in a racially gerrymandered district is that you would get to vote in a non-racially gerrymandered district, which presumably would be, would be different in some way. Here, you know, you have a Senator and the governor is saying that in the absence of this requirement, you would have exactly the same Senator. So I'm struggling to see what, what difference the law is making. I'd say yes. And Judge Miller, I'd say yes because what you just described is the vote dilution aspect of the harm. But as Hayes makes clear, there's also a representational harm. So I just laid out, and those are two distinct injuries, the vote dilution in the terms of your vote, not really counting because it's been diluted, but then also the lack of representation for the reasons that I, that I just read in the quote. I'd also note that we cited. Lack of representation. We previously talked about the fact that the state does have one Senator acting unlike what would happen in the House. Are you saying that because during that temporary period, there's only one that the person with standing, presumably is injured in some way? No. Under Burdick? The harm is that it, let's say that there was an election and Senator McSally won. It turns out there was an election and she lost, but let's say different race. She wins. She's a Republican. There's no claim because even if there is a representational loss to someone as a Democrat or an independent or libertarian, the election decided that done. But here, why there is one is the state has come in and hasn't been a result of an election, but there has been state action. Remember the first amendment. You have, you know, that satisfies traceability and I'm not sure it does. How is it redressable? Because even if we issued an order to Governor Ducey, you go ahead and do the appointment without regard to these. He says, okay, here's the same Senator over again. I mean that it's not redressable, is it? I think it is redressable because it's, it's a state loss. The state cannot sanction that type of, of partisan representation. It's for, it serves a partisan purpose, not a governmental interest. I'm out of time. If I could have 15 seconds, my colleagues, other questions that you have. Do you have one quick wind up? That's going to just knock us off our socks. One quick thing. I just say you're asking what the remedy is. I think we set those out at the end of our opening brief. And if you look at the fourth one, I'd cite you to judge Weinstein's decision. It was a versatile Kanti for one way to do it by deferring to the state, the judge to case. That's the, the appendix case for a different way to do it. And keep in mind that this is up here on a rule 12 motion. So we didn't get the rule 12. We didn't get the benefit of developing a record. We didn't get the benefit of a pretrial conference to amend the complaint. And there's no record on which to satisfy the Burdick standard. And it still ties it. Thank you. We thank you counsel. And we thank you as well. I appreciate the arguments are very interesting and difficult, but important case. So we thank you for your representations. The case just argued is submitted and the court stands adjourned. This court for this session stands adjourned.
judges: M. Smith, Miller, Collins